THE CHARLES HEBARD, etc.

LYONS *et al. v.* THE CHARLES HEBARD, etc.

(*District Court, E. D. Michigan.* February 18, 1891.)

1. COLLISION—NEGLIGENT TOWAGE.
   The tug A., with two schooners in tow, was ascending the St. Clair. She was just passing a raft 1,800 feet long and 250 feet wide, followed at some distance by the steamer H., with three schooners in tow. Passing signals were exchanged that the tows should go starboard to starboard. The A. hugged the American shore so closely that upon the approach of the H., or almost immediately afterwards, she and her tow were grounded. The H., having been advised further up the stream of the presence of the raft, was running very slowly, and, after rounding the corner of the raft, and running along-side near enough to touch it, received a hail from the first schooner that her tow-lines were in danger of fouling with the raft, and checked her speed further, and her tow, loosing steerage-way, was swept by the current into collision with the tow of the A. *Held*, that the H. was at fault in permitting her tow to lose the necessary steerage-way.

2. SAME—INEVITABLE ACCIDENT.
   An inscrutable cause of collision will not be assumed because the fault of navigation does not appear by the proof, if the physical conditions be such that they fairly repel the suggestion of inevitable accident and indicate some unknown bad management as the real cause of the injury.

In Admiralty.

The tug American Eagle, with two schooners in tow, was ascending the St. Clair river just below the lower end of the south-east bend. A raft 1,800 feet long and about 250 feet wide, in tow of a tug, was descending the same bend, followed some distance above by the steamer Charles Hebard, with three schooners in tow. The tows were all attached by lines about 500 feet long, each. Above the bend the Hebard was notified by a passing steamer to look out for a raft below. She was then under full headway, but soon after this notice checked her speed somewhat. The night was clear, and the wind from the eastward, but

not of disturbing force. The position of the raft in the river was a matter of dispute, and the people in charge of it not being found as witnesses, the conflict is one between the parties to the suit. The testimony of the ascending tow placed the raft some 1,500 or 2,000 feet further down the bend than that of the descending tow. The American Eagle testified that the raft lay diagonally across the river, with the after end so near to the American shore that he could not safely pass it without endangering his schooners; whereupon he pushed the bow of his tug against it, and shoved that end of the raft further out into the river, with the starboard corner just about mid-stream, but lapping towards the American shore, and by this means the raft passed clear of his tow, but very near to them. But in executing this maneuver he was so crowded that he was almost upon the American shore, which he had hugged as closely as possible all the way up the raft. Just as he was completing the maneuver of shoving the raft out of his way, the Hebard appeared, and he signaled her that there was danger, which signal the Hebard denied hearing, however. Passing signals were exchanged that the tows should go starboard to starboard, and the American Eagle, crowding closer to the American shore upon seeing the Hebard approach, and putting her wheel to starboard, ran upon the bank and grounded, as did her schooners. The Hebard and her first schooner passed quite near to the American Eagle, and still nearer to her first and second schooners, but the second schooner of the Hebard came into collision with the first schooner of the American Eagle with a glancing blow, possibly without more than touching, and, taking foul of her anchor tore it from its fastenings and carried away its chain, tore out the cat-head and part of the railings, after which she came into collision with the second schooner of the American Eagle, with which she became entangled, and was held fast until morning. The third schooner of the Hebard's tow came into more violent collision with the first schooner of the American Eagle's tow, and, fouling with her, was likewise held fast until morning. The testimony of the Hebard places the raft higher up the river and the American Eagle and her tow still lower down and passing along-side the raft, when she first came into view. The Hebard saw the raft 400 or 500 feet ahead of her, and immediately checked her speed for the second time. The raft was close to the Canadian shore, holding well up against it, with its rear end about mid-stream. The space between it and Canadian shore was so narrow that he could see the water only a ship's length ahead, and, having determined to pass to the starboard of the raft, he signaled the American Eagle and her tow that he would go starboard to starboard with him. Rounding the corner of the raft, he passed near enough to touch, and went ahead, close along-side the raft; but receiving a hail from his first schooner that her tow-lines were in danger of fouling with the raft, he checked again for the third time, and brought the revolutions of the engine to about 20 per minute, after which he went ahead stronger until the collision and the parting of himself and his first schooner from the other two, the tow-line having been cast loose by that schooner when she observed the collision. The Hebard's testimony is that the Ameri-

can Eagle and her tow were afloat, and moving up, and they thought outward, at least as to the schooners, at the time they rounded the raft; but it is a conceded fact that the proof shows quite conclusively that if the American Eagle and her tow were not aground at the moment of collision, the grounding and collision were almost simultaneous, and the fact of the grounding and its place of occurrence was fixed by the situation the next day, when the vessels were separated. The owners of the schooners in tow of the American Eagle filed this libel for damages against the Hebard.

*Moore & Canfield*, for libelants.

*H. D. Goulder*, for respondent.

HAMMOND, J., (*after stating the facts as above.*) The decree in this case must be for the libelants, with costs, and the usual reference will be made to ascertain the damages. The court cannot see any fault on the part of the tug American Eagle or the vessels in her tow contributing to this collision in the least degree. The only fault imputed is that she did not stop below until the raft had passed out of the way, or until the Hebard had cleared it. This is equivalent to a demand on the part of the Hebard for the right of way upon about half of the river, with ample room, according to the testimony, for two such tows to pass between the raft and the American shore of the St. Clair river, at the south-east bend. By the Hebard's testimony the raft was so near to the Canadian shore when she rounded it that she could see but little water between them, and it was impossible for her to take that side of the raft; also that she kept within a very few feet of the raft on that side next the American shore. If this be so, she had the most abundant room and water—more than 250 feet—for the joint navigation of herself and the American Eagle and her tow on that side the raft. The most ordinary skill would have accomplished such a passage, although all the witnesses say the presence of the raft and the nature of the bend made it necessary to be careful, and call it "close." The experts say that there should have been no difficulty in such a situation. It is therefore preposterous to demand that the up-going tow should stop and give the whole space to the Hebard and her tow coming down. Whether the American Eagle and her tow were aground, as they say, on the American shore, or were moving up, as the Hebard people say, at the time the latter appeared upon the scene, the former could not be in fault, for nobody denies that they were hugging the American shore desperately, in order to keep out of the way, whether of the raft or the Hebard is immaterial. If the Hebard's story be true, she was doing this to keep out of her way; if the American Eagle's story be true, then, out of the way of the raft; but howsoever this be, she could, in that situation, be in no fault. Having the right to be there, she was doing the best she could to give all possible room to the Hebard and the raft. The court finds her without fault.

The mere happening of the collision, in such a case, would seem to throw the blame on the Hebard, in the absence of any showing by her

of a cause for which she was not responsible in the sense that it was unavoidable by her. But it is urged that the case of *The Worthington*, 19 Fed. Rep. 836, imposes on the libelant the duty of locating the fault of the Hebard by proof that shall convince the court that the force causing the collision came of her negligence; otherwise, it is said the fault is inscrutable, the accident inevitable, and that the libel must be therefore dismissed. It does not seem to the court that that case is entirely applicable to this, though apparently so nearly alike. There the court found that neither vessel was in. fault; saying that the colliding vessel had removed by proof the presumption of fault on her part arising from the fact of collision, the victim being without fault. Undoubtedly this presumption is, even at common law, not always conclusive, possibly not even always *prima facie;* or rather it may be said that the presumption of negligence does not arise inevitably from the bare happening of a collision. It depends upon the circumstances of any case, and most largely on the nature of the injury itself, as indicating the cause of it to have been the negligence of the defendant, although the precise physical causation may be obscure, or possibly inscrutable. I do not understand the case to hold that the actual cause must be made apparent, and not left in doubt, as a cause producing the physical operation of forces that inflict the injury. So we are thrown back on the inquiry of fact as to negligence upon the just measure of the probative value of the accident itself in its relation to the circumstances shown to be attending it. Given the fact that the injured vessel is seen to be without fault, or even without a suspicion of any; given the fact that there were nearly 300 feet of open water between the edge of the raft and the American shore; given the fact that there was no force in the sweep of the current or no obstacle in the trend of the bend that was not always in that bend and that current, if not in all bends and all currents; given the fact that there was no hindrance in the wind or light, nothing in any of the elements that ordinary skill in navigation should not always anticipate at that time and place, and under the conditions then present,—and it does seem to me that the negligence of the Hebard is conclusively demonstrated by the happening of the collision itself, whether we can, under the proof, point out the precise fault in navigation or not; and it further seems to me that there is nothing in the case of *The Worthington, supra,* which breaks the force of this conclusion.

But taking that case for all that the defendant claims, and the facts here point with reasonable certainty to the fault; taking also everything the Hebard's people say to be true as sworn, and it sufficiently appears that the current drifted the offending vessels in the Hebard's tow against the injured vessels in the tow of the American Eagle, the force of the current being somewhat supplemented, perhaps, by the force from the towlines, from which had been gathered a momentum not then entirely lost. How should these natural forces have been overcome to prevent the collision? By sufficient counteracting force applied by the Hebard; for it is plain there was no bad navigation on the part of her vessels in tow which inflicted the injury. When we see that she was running under

slow bells which had been checking her from the time when far away up the river she had been told to look out for the raft below, that she had reduced her speed to so low a point that her communicated force to the vessels in tow was not sufficient to overcome the drift of the current, and the remaining momentum, which in the situation had a tendency to aid the current, as it swung the vessels with it along the concave side of the bend. Sufficient force would have swept them the other way; less than enough left the vessels helpless, and without the headway to steer them safely. The witnesses who say they had sufficient headway for steerage purposes are either mistaken in this, or they are mistaken in their opinion that sufficient steerage-way was all that was needed; and more must have been required, because absolutely there is no other possible force acting to bring about this collision than those already indicated; and as these same witnesses are just as certain that they steered their vessels properly and did the utmost to turn them aside, if there had been sufficient steerage-way they would have accomplished their purpose. Here I attach much importance to the two competent and satisfactory experts that were examined. They agreed that there was nothing extraordinary in the situation as described by defendant; that while it required careful and skillful management, there was abundant room for passing. But they said the situation demanded that the speed should be maintained, and rather increased than diminished, so that the vessels in tow should be held up against the current and swept, as it were, through the place. I cannot agree, in our present knowledge of the forces at work in such plain situations as those we have here, that there may have been some mysterious, hidden, or inscrutable cause which no one in this case can divine. I should rather believe that the testimony was mistaken or false, and proceed to find the cause of the collision as against it; but that is unnecessary here, I think. However, we must not allow tenderness for witnesses, nor a good-natured impulse to believe what is sworn to be true, to assent too readily to the suggestion of an inscrutable cause or inevitable accident, which mistake would be the result of a too easy finding, through such tenderness, that the navigation was faultless. If we are correct in divining the force which caused this collision, we are certainly correct in "locating the fault of the navigation," and this answers the most expanded sense of that term used by counsel in urging the principle of the *Worthington Case*, with which I entirely agree, though I do not think it means all that counsel urge in that behalf.

As to the excuse that the slowing down under the last checking bell was done to prevent a fouling of the towing-line with the logs of the raft, it may be said that that situation was either the result of previous checking or of running unnecessarily close to the raft, or some other mismanagement of the lines or of the navigation. Ordinary skill or care in navigation is surely equal to the task of preventing such a fouling without the sacrifice of sufficient headway to manage the tow. The presence of a raft in a canal is not an extraordinary danger, and the turning it in even close quarters can surely be accomplished without throwing away a tow

of vessels by permitting the currents to lash them, whip-like, against the bank or against another vessel on the bank, whether aground or moving closely to it.

So far we have considered the case upon the proof of defendant's witnesses, not taking everything they say to be true, and particularly not all the opinions they express, but substantially giving credit to them, and believing that they swear as they saw the facts, and only correcting errors of evidence by the other proof pertinent thereto; and this is all the court can ever do, for it is not bound to believe everything a witness swears, although he be a credible witness. Credible witnesses are often mistaken. But turning now for a moment to the libelants' proof, and the negligence of the Hebard becomes established so firmly that the learned counsel for the defendant do not deny it. And I must say that, in my judgment, the corroborating facts more nearly confirm the libelants' story than that of the defendant, not as before said, in all that which these witnesses say, and in their expressed opinions, but substantially. And I say this without imputing falsehood to the Hebard's people, for I believe they testified according to the appearance of things to them. For example, I think her captain believed the raft was so close to the Canadian shore that it was unsafe for him to take that chute. But the fact of the collision itself, the crowding of the American Eagle and her tow upon the American bank, the closeness with which the Hebard crowded and kept to the raft, all convince me that the raft had been and was closer—very much closer—to the American shore than he thought it was, and that it would probably have been safer for him to go between the raft and the Canadian side, and was, perhaps, a fault of navigation not to do this. But whether this be so or not, if the raft was in the river at the place where the libelants locate it, then, although it was only an error of judgment not to take the Canadian side of the raft, the fault in navigation after choosing the other side is not denied, as before stated, by learned counsel. The American Eagle had crowded the tail of the raft away from its threatening position toward her tow by pushing her prow against it until it had passed, and the Hebard did not take around the raft until it was much farther down the river than she locates it by her own proof. This maneuver of the American Eagle was made before the Hebard appeared, and she had already been crowded aground on the American shore, though this grounding occurred almost simultaneously with the Hebard's appearance. There was no time to show anchor lights, but the Hebard knew of the presence of the tow, and ought to have recognized its helpless condition; at least, she ought to have known that it was as close in shore as it could get, and to have governed herself accordingly. It was a fault to lose headway or give away speed until her own tow should drift helplessly against this grounded tow on her starboard, or against a tow already crowded over as close as possible to the American shore, and just as helpless, almost, as if grounded. I might array details of proof further showing this corroboration of the libelants' story of this disaster, but it is sufficient to say that the great facts—the established facts—conform

more sensibly to that story than the other, in my judgment.    The result of this consideration of the libelants' proof is the same as before, the cause of collision is precisely the same, the negligence the same, and the only difference between the two is that the situation as described by libelants is much more likely to have brought about the collision than the other. It accounts for it far more satisfactorily, and more clearly indicates the cause to have been that which it must also have been in the situation described by defendant.    It is hardly necessary to say that in this view the Hebard is liable, and in some sense it is quite immaterial which may be found to have been the true relative situation of the vessels, whether that given by the defendant or by the libelants.

The decree will be as before ordered.